1  SCHIFFRIN BARROWAY TOPAZ & KESSLER, LLP
   Alan R. Plutzik, Of Counsel (Bar No. 077758)
2  L. Timothy Fisher, Of Counsel (Bar No. 191626)
3  2125 Oak Grove Road, Suite 120
   Walnut Creek, CA 94598
4  Telephone: (925) 945-0770
   Facsimile: (925) 945-8792
5
   *Attorneys for Plaintiffs*
6
7  [Additional Counsel Appear on Signature Page]

8              **UNITED STATES DISTRICT COURT**

9              **NORTHERN DISTRICT OF CALIFORNIA**

10 PHYNICE KELLEY, Individually and On Behalf
11 of All Others Similarly Situated,                )
                                                    )
12                     Plaintiff,                   )  CIVIL ACTION NO.
                                                    )  C08-00683
13          vs.                                     )
                                                    )  CLASS ACTION COMPLAINT
14                                                  )
                                                    )
15 SHORETEL, INC., JOHN W. COMBS, MICHAEL           )
   E. HEALY, EDWIN J. BASART, GARY J.               )  **JURY TRIAL DEMANDED**
16 DAICHENDT, THOMAS VAN OVERBEEK,                  )
   KENNETH D. DENMAN, CHARLES D.                    )
17 KISSNER, EDWARD F. THOMPSON, LEHMAN              )
   BROTHERS, INC., J.P. MORGAN SECURITIES,          )
18 INC., and PIPER JAFFRAY & CO.,                   )
                                                    )
19                                                  )
                                                    )
20                     Defendants.                  )

21        Plaintiff, Phynice Kelley ("Plaintiff"), alleges the following based upon the investigation by

22 Plaintiff's counsel, which included, among other things, a review of the defendants' public

23 documents, conference calls and announcements made by defendants, United States Securities and

24 Exchange Commission ("SEC") filings, wire and press releases published by and regarding

25 ShoreTel, Inc. ("ShoreTel" or the "Company"), securities analysts' reports and advisories about the

26 Company, and information readily available on the Internet, and Plaintiff believes that substantial

27 additional evidentiary support will exist for the allegations set forth herein after a reasonable

28 opportunity for discovery.

Case 3:08-cv-00683-CRB    Document 1    Filed 01/29/2008    Page 2 of 24

## NATURE OF THE ACTION AND OVERVIEW

1. This is a federal class action on behalf of purchasers of the common stock of ShoreTel, who purchased or otherwise acquired ShoreTel common stock pursuant or traceable to the Company's July 3, 2007 Initial Public Offering (the "IPO" or the "Offering"), seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act").

2. ShoreTel is a provider of unified communications solutions, enabling companies to integrate all communications--voice, data, messaging--with their business processes. ShoreTel is headquartered in Sunnyvale, California, and has regional offices in the United Kingdom, Sydney, Australia and Munich, Germany.

3. On July 3, 2007, the Company conducted its IPO. In connection with its IPO, the Company filed a Registration Statement and Prospectus (collectively referred to as the "Registration Statement") with the SEC. The IPO was a financial success for the Company, as it raised over $75 million by selling 7.9 million shares of stock to the public at a price of $9.50 per share.

4. On January 7, 2008, the Company shocked investors when it announced that its revenue for the second quarter would be in the range of $29.7 to $30.7 million, far lower than its previous expectation of $32 to $35 million, and significantly lower than analysts had predicted.

5. In response to this news, shares of the Company's stock declined $7.06 per share, or 54 percent, to close on January 7, 2008 at $6.02 per share, on unusually heavy trading volume.

6. The Complaint alleges that, in connection with the Company's IPO, defendants failed to disclose or indicate the following: (1) that ShoreTel knew that it would be unable to compete with other companies offering similar products and services and would therefore be unable to attract a sufficient amount of new customers to maintain revenue levels and projections; (2) that the Company knew that demand for its service was waning due to an increase in alternative technology and that it would be unable to attract a sufficient number of new customers, as most consumers who desired such voice-integrated services were already customers of ShoreTel or of a competitor; (3) that the Company had excess inventory due to a decline in new demand for its products; (4) that the Company had prematurely stuffed its distribution networks, while at the same time, pulling sales forward into earlier periods; (5) that the Company lacked adequate internal and financial controls;

1   and (6) that, as a result of the foregoing, the Company's Registration Statement was false and

2   misleading at all relevant times.

3       7.    As a result of defendants' wrongful acts and omissions, and the precipitous decline in

4   the market value of the Company's securities, Plaintiff and other Class Members have suffered

5   significant losses and damages.

6   **JURISDICTION AND VENUE**

7       8.    The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and 15

8   of the Securities Act (15 U.S.C. §§ 77k and 77o).

9       9.    This Court has jurisdiction over the subject matter of this action pursuant to Section

10   22 of the Securities Act (15 U.S.C. § 77v).

11       10.    Venue is proper in this Judicial District pursuant to Section 22 of the Securities Act.

12   Many of the acts and transactions alleged herein, including the preparation and dissemination of

13   materially false and misleading information, occurred in substantial part in this Judicial District.

14   Additionally, the Company's principal executive offices are located within this Judicial District.

15       11.    In connection with the acts, conduct and other wrongs alleged in this Complaint,

16   defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

17   including but not limited to, the United States mails, interstate telephone communications and the

18   facilities of the national securities exchange.

19   **PARTIES**

20       12.    Plaintiff, Phynice Kelley, as set forth in the accompanying certification, incorporated

21   by reference herein, purchased ShoreTel common stock at artificially inflated prices during the Class

22   Period and has been damaged thereby.

23       13.    Defendant ShoreTel is a Delaware corporation with its principal executive offices

24   located at 960 Stewart Drive, Sunnyvale, California.

25       14.    Defendant John W. Combs ("Combs") was, at all relevant times, the Company's

26   President, Chief Executive Officer ("CEO"), Chairman of the Company's Board of Directors, and a

27   co-founder of ShoreTel.

28       15.    Defendant Michael E. Healy ("Healy") was, at all relevant times, the Company's

CLASS ACTION COMPLAINT

1    Chief Financial Officer ("CFO") and Principal Accounting Officer.

2        16.    Defendant Edwin J. Basart ("Basart") was, at all relevant times, the Company's Chief

3    Technology Officer, a member of the Board of Directors, and a co-founder of Shoretel.

4        17.    Defendant Gary J. Daichendt ("Daichendt") was, at all relevant times, a member of

5    the Company's Board of Directors.

6        18.    Defendant Kenneth D. Denman ("Denman") was, at all relevant times, a member of

7    the Company's Board of Directors.

8        19.    Defendant Charles D. Kissner ("Kissner") was, at all relevant times, a member of the

9    Company's Board of Directors.

10       20.    Defendant Thomas Van Overbeek ("Overbeek") was, at all relevant times, a member

11   of the Company's Board of Directors.

12       21.    Defendant Edward F. Thompson ("Thompson") was, at all relevant times, a member

13   of the Company's Board of Directors.

14       22.    Defendants Combs, Healy, Basart, Daichendt, Denman, Kissner, Overbeek and

15   Thompson are collectively referred to hereinafter as the "Individual Defendants." The Individual

16   Defendants, because of their positions with the Company, possessed the power and authority to

17   control the contents of ShoreTel's quarterly reports, press releases, documents, and presentations to

18   securities analysts, money and portfolio managers and institutional investors, i.e., the market. Each

19   defendant was provided with copies of the Company's reports and press releases, documents alleged

20   herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to

21   prevent their issuance or cause them to be corrected. Because of their positions and access to

22   material non-public information available to them, each of these defendants knew that the adverse

23   facts specified herein had not been disclosed to, and were being concealed from, the public, and that

24   the positive representations which were being made were then materially false and misleading. The

25   Individual Defendants are liable for the false statements pleaded herein, as those statements were

26   each "group-published" information, the result of the collective actions of the Individual Defendants.

27       23.    Defendants Lehman Brothers, Inc. ("Lehman Bros."), J.P. Morgan Securities, Inc.

28   ("J.P. Morgan") and Piper Jaffray & Co. ("Piper Jaffray") served as financial advisors and assisted in

1 the preparation of ShoreTel's IPO.

2     24.    Defendants Lehman Bros., J.P. Morgan and Piper Jaffray are collectively referred to

3 hereinafter as the "Underwriter Defendants."

4 **SUBSTANTIVE ALLEGATIONS**

5 **Background**

6     25.    ShoreTel is a provider of unified communications solutions, enabling companies to

7 integrate all communications--voice, data, messaging--with their business processes. ShoreTel is

8 headquartered in Sunnyvale, California, and has regional offices in the United Kingdom, Sydney,

9 Australia and Munich, Germany.

10     26.    On July 3, 2007, the Company conducted its IPO. In connection with the IPO, the

11 Company filed a Registration Statement and Prospectus (collectively referred to as the "Registration

12 Statement") with the SEC. The IPO was a financial success for the Company, as it was able to raise

13 $75.05 million by selling shares of stock to the public at a price of $9.50 per share.

14     27.    To announce its IPO, ShoreTel issued a press release entitled "ShoreTel Prices Initial

15 Public Offering." Therein, the Company, in relevant part, stated:

16         ShoreTel, Inc., a leading provider of enterprise IP telephony
17         solutions, today announced the pricing of its initial public offering of
        7,900,000 shares of its common stock at a price to the public of $9.50
18         per share. In addition, ShoreTel® has granted the underwriters a 30-
        day option to purchase up to an additional 1,185,000 shares of
19         common stock. ShoreTel's common stock will trade on the Nasdaq
        Global Market under the ticker "SHOR".
20

21         Lehman Brothers Inc. and J.P. Morgan Securities Inc. are acting as
        joint book-running managers for the offering, and Piper Jaffray &
22         Co., JMP Securities LLC, and Wedbush Morgan Securities Inc. are
        acting as co-managers.

23         The offering is being made only by means of a prospectus, a copy of
24         which may be obtained from the prospectus department of Lehman
        Brothers Inc., c/o Broadridge, 1155 Long Island Avenue, Edgewood,
25         NY   11717   (fax:   1-631-254-7140,   or   e-mail   at
        qiana.smith@broadridge.com) or from J.P. Morgan Securities Inc., 4
26         Chase Metrotech Center, CS Level; Brooklyn, New York 11245
        (telephone: 1-866-430-0686).
27

28

**Materially False and Misleading**
**Statements Made in the Registration Statement**

28.    Regarding the Company's financial growth, the Registration Statement, in relevant part, stated:

> *We have experienced significant growth in recent periods, with our total revenue growing from $18.8 million for 2004 to $61.6 million for 2006. This growth in revenue has largely been driven by increased demand for IP telecommunications systems from new enterprise customers, as well as sales of additional products to our installed enterprise customer base.* Our operating expenses have also increased significantly from $15.7 million for 2004 to $30.4 million for 2006. This growth in operating expenses has primarily been driven by our growth in headcount, from 76 employees at June 30, 2004 to 174 employees at June 30, 2006, and to 250 employees at March 31, 2007. We expect to continue to add personnel in all functional areas, including additional sales and support personnel. [Emphasis added.]

29.    In reporting the Company's recent financial figures, the Registration Statement, in relevant part, provided data in the following charts:

| | Year Ended June 30 | | | Nine Months Ended March 31 | |
|---|---|---|---|---|---|
| | 2004 | 2005 | 2006 | 2006 | 2007 |
| **(Dollars in thousands, except per share amounts)** | | | | | |
| **Consolidated statement of operations data:** | | | | | |
| Revenue: | | | | | |
| Product | $16,587 | $31,970 | $55,300 | $37,972 | $61,473 |
| Support and services | $2,241 | $3,512 | $6,308 | $4,552 | $7,431 |
| Total revenue | $18,828 | $35,482 | $61,608 | $42,524 | $68,904 |
| Cost of revenue: | | | | | |
| Product (I) | $7,725 | $13,961 | $21,855 | $15,723 | $21,271 |
| Support and services (I) | $1,660 | $2,907 | $5,425 | $3,942 | $4,853 |
| Total cost of revenue | $9,385 | $16,868 | $27,280 | $19,665 | $26,124 |
| Gross Profit | $9,443 | $18,614 | $34,328 | $22,859 | $42,780 |

\*                    \*                    \*

| | Year Ended June 30 | | | Nine Months Ended March 31 (unaudited) | |
|---|---|---|---|---|---|
| | 2004 | 2005 | 2006 | 2006 | 2007 |

**(Dollars in thousands)**
**CASH FLOWS FROM OPERATING ACTIVITIES:**

CLASS ACTION COMPLAINT

| | | | | |
|---|---|---|---|---|
| Net income (loss) | $ (6, 251) | $ (1,402) | $4,002 | $2,332 | $4,188 |

Adjustments to reconcile net income (loss) to net cash provided by (used in) operating activities:

| | | | | | |
|---|---|---|---|---|---|
| Accounts payable | $1,199 | $1,020 | $809 | $ (1,066) | $3,780 |
| | | * | * | * | |
| Deferred revenue | $1,167 | $2,841 | $1,505 | $937 | $5,398 |
| Net cash provided by (used in) operating activities | $ (5,392) | $ (4,957) | $7,266 | $4,525 | $5,039 |

30.    With regard to the Company's financial monitoring, the Registration Statement, in relevant part, stated:

> We monitor a number of key metrics to help forecast growth, establish budgets, measure the effectiveness of sales and marketing efforts and measure operational effectiveness.
>
> **Initial and repeat sales orders.** *Our goal is to attract a significant number of new enterprise customers and to encourage existing enterprise customers to purchase additional products and support. Many enterprise customers make an initial purchase and deploy additional sites at a later date, and also buy additional products and support as their businesses expand.* As our installed enterprise customer base has grown we have experienced an increase in revenue attributable to existing enterprise customers, which currently represents a significant portion of our total revenue.
>
> **Deferred revenue.** Nearly all system sales include the purchase of post-contractual support contracts with terms of up to five years, and our renewal rates on these contracts have been high historically. We recognize support revenue on a ratable basis over the term of the support contract. Since we receive payment for support in advance of our recognizing the related revenue, we carry a deferred revenue balance on our consolidated balance sheet. This deferred revenue helps provide predictability to our future support and services revenue. Accordingly, the level of purchases of post-contractual support with our product sales is an important metric for us along with the renewal rates for these services. Our deferred revenue balance at March 31, 2007 was $12.0 million, of which $8.5 million is expected to be recognized within one year.
>
> **Gross margin.** Our gross margin for products is primarily affected by our ability to reduce hardware costs faster than the decline in average overall system prices. We have been able to increase our product gross margin by reducing hardware costs and through product redesign and volume discount pricing from our suppliers. For example, in 2004, we introduced our current family of switches and IP phones, which generally improved our gross margin. We have also introduced new, lower cost hardware following these introductions,

CLASS ACTION COMPLAINT

which has continued to improve our product gross margin. In general, product gross margin on our switches is greater than product gross margin on our IP phones. As the prices and costs of our hardware components have decreased over time, our software components, which have lower costs than our hardware components, have represented a greater percentage of our overall system sales. We consider our ability to monitor and manage these factors to be a key aspect of maintaining product gross margins and increasing our profitability.

Gross margin for support and services is significantly lower than gross margin for products, and is impacted primarily by personnel costs and related expenses. The primary goal of our support and services infrastructure are made with this goal in mind. We expect that as our installed enterprise customer base grows, we will be able to improve gross margin for support and services through economies of scale. However, the timing of additional investments in our support and services infrastructure could materially affect our cost of support and services revenue, both in absolute dollars and as a percentage of support and services revenue and total revenue, in any particular period.

**Operating expense management**. To date, we have managed our operating expenses so that they have generally increased at a slower rate than our revenue growth, and we intend to continue to do so in the future. Our operating expenses are comprised primarily of compensation and benefits for our employees and, therefore, the increase in operating expenses has been related to increases in our headcount. We intend to expand our workforce to support our anticipated growth, and therefore our ability to forecast revenue is critical to managing our operating expenses. [Emphasis added.]

31.    In describing the Company's internal financial reporting, the Registration Statement, in relevant part, stated:

**Internal Control Over Financial Reporting**

In connection with the audit of our financial statements for the six-month period ended December 31, 2006, our independent registered public accounting firm noted in their report to our audit committee that we have material weaknesses and significant deficiencies in our internal control over financial reporting as of December 31, 2006 that could, if not remedied, affect our ability to record, process and report financial data. In their report, our independent registered public accounting firm has noted two specific material weaknesses:

> • we do not have a sufficient number of accounting personnel with the relevant technical accounting and financial reporting

CLASS ACTION COMPLAINT

experience and skills to facilitate the preparation of timely and accurate consolidated financial statements; and

*• we do not have sufficient internal controls related to the identification of all products and services associated with a sales arrangement, including commitments made by our sales and marketing personnel and channel partners to provide specified upgrades, services or additional products to customers in the future, including through product roadmap presentations to customers.*

If VSOE of fair value does not exist for commitments to provide specified upgrades, services or additional products to customers in the future, as has been the case from time to time in the past, we defer all revenue from the arrangement until the earlier of the point at which VSOE of fair value does exist or all such elements from the arrangement have been delivered.

In addition to the material weaknesses noted by our independent registered public accounting firm, the following two significant deficiencies in the design or operation of our internal control over financial reporting were also noted:

• we do not accurately maintain data sufficient to readily track and validate the existence of fixed assets and we have no formal procedures in place to ensure that fixed assets continue to be held and used;

• we do not have adequate procedures for identifying and recording period-end accrued expenses and in-transit inventory.

These material weaknesses and significant deficiencies resulted in a number of audit adjustments to our consolidated financial statements for the six-month period ended December 31, 2006 that were noted during the course of the audit. In addition, these material weaknesses and significant deficiencies contributed to delays in the completion of our financial statements. [Emphasis added.]

32.    Finally, with regard to the Company's actions to improve perceived control and procedure issues, the Registration Statement, in relevant part, stated:

*We are in the process of taking steps intended to remedy these material weaknesses and significant deficiencies. Since both material weaknesses relate at least in part to inadequate staffing, we are addressing them through the hiring of additional personnel. We hired a new Chief Financial Officer in May 2007, and we are currently seeking to hire a Corporate Controller, a Revenue Accounting Manager and other finance and accounting personnel.*

CLASS ACTION COMPLAINT

*Further, we expect that our former Chief Financial Officer, John Finegan, will be actively employed as our Vice President of Finance for an indefinite period as new staff members are hired and integrated.*

To further address the material weakness related to the proper accounting for sales arrangements containing future commitments, we are implementing additional procedures and training programs for all personnel involved in the selling and marketing of our products and services and in the preparation of our financial statements. We have also analyzed product roadmaps used for sales presentations to determine when or if a specified upgrade right has been provided to a customer notwithstanding that a contract does not explicitly provide for that right. For sales prior to March 31, 2007, we identified a few instances in which we created specified upgrade or enhancement rights as a result of these roadmap presentations. However, these were not significant to our results of operations or financial statements. We are continuing to analyze our product roadmap presentations used in connection with sales made subsequent to March 31, 2007. If it is subsequently determined that these presentations resulted in commitments for specified upgrades or enhancements, we would be required to defer the recognition of revenue attributable to such sales until such commitments had been satisfied. [Emphasis added.]

33.    The statements contained in ¶¶ 28 - 32 were materially false and misleading when made because defendants failed to disclose or indicate the following: (1) that ShoreTel knew for a fact that it would be unable to compete with other companies offering similar products and services and would therefore be unable to attract a sufficient amount of new customers to maintain revenue levels and projections;  (2) that the Company knew for a fact that demand for the service it provides was waning due to an increase in alternative technology and that it would be unable to attract sufficient numbers of new customers, since most who desired such voice-integrated services were already customers of ShoreTel or of a competitor; (3) that the Company had excess inventory due to a decline in new demand for its products line; (4) that the Company had prematurely stuffed its distribution networks, while at the same time, pulling sales forward into earlier periods; (5) that the Company lacked adequate internal and financial controls, and had failed to conform to the minimum standards of good Corporate Governance; and (6) that, as a result of the foregoing, the Company's Registration Statement was false and misleading at all relevant times.

CLASS ACTION COMPLAINT

**Post-IPO Statements**

34.    On July 17, 2007, the Company, pursuant to Form 8-K, filed a statement with the SEC entitled "Approval of Executive Bonus Plan for First Half of Fiscal Year 2008." Therein, the Company, in relevant part, stated:

> On July 11, 2007, the Compensation Committee (the "Committee") of the *Board of Directors of ShoreTel, Inc. (the "Company") approved the Executive Bonus Plan for the first six months of fiscal year 2008 (the "Plan"). Individuals who are deemed to be "officers" of the Company for purposes of Section 16 of the Securities Exchange Act of 1934, as amended ("Executive Officers"), including each of the Company's named executive officers, are eligible to receive cash awards following December 31, 2007, based upon the attainment of performance objectives established by the Committee for the six-month period,* the size of the bonus pool and each participant's performance rating. The performance objectives under the Plan consist of pre-defined ranges of: (i) revenue; (ii) non-GAAP operating profit; and (iii) customer satisfaction, based on scores from the Company's satisfaction surveys. *The bonus pool is equal to the product of (a) a percentage determined under the Plan, based on the extent to which all three performance objectives are achieved within the pre-defined ranges established by the Committee, multiplied by (b) a dollar amount equal to 45% times the sum of each participant's base salary six-month period, except for the CEO, a dollar amount equal to 85% of the CEO's base salary for the six-month period.* Each participant's performance rating depends on the participant's achievement of pre-defined individual performance goals and objectives established for the participant by the Committee, and may be adjusted by the Committee to reflect his or her achievement relative to the achievement of other participants.
>
> *Under the Plan, the bonus target for the Company's Chief Executive Officer is currently 85% of his base salary, and the target bonus is 45% of base salary for other Executive Officers.* The maximum cash award any participant may receive under the Plan is 225% of that participant's target bonus, although total payments under the Plan cannot exceed the bonus pool. [Emphasis added.]

35.    On August 14, 2007, the Company issued a press release entitled "ShoreTel Reports Financial Results for Fourth Quarter and Fiscal Year 2007." Therein, the Company, in relevant part, stated:

> *"We are pleased with our fourth quarter and fiscal year financial results,"* commented *John W. Combs, chairman, president and CEO of ShoreTel.* "We achieved close to $100 million in revenue in

- 11 -

fiscal 2007 which represents a major milestone in our business. Our growth resulted from increasing market acceptance of the ShoreTel IP telephony system, the productivity of our high-quality channel partners, and our leadership position in overall customer satisfaction. *We believe our advanced distributed architecture provides customers with a communications systems that is the easiest to install, manage and use, while also providing the industry's highest reliability and a low overall total cost of ownership.*

*"The completion of our IPO is expected to build additional brand awareness that will enable us to compete in more sales opportunities. We plan to broaden our channel programs to reach larger customers both domestically and internationally. Our unique architecture is a major competitive differentiator and a key factor in driving our compelling win rate.*

*"We believe that our progress to date is a positive indicator of the opportunity ahead. We are optimistic about our outlook for 2008 and are planning for revenue growth of 40-45% over the prior year. ShoreTel is well-positioned to rapidly grow our top line revenue, expand our customer base and bring new and exciting products and services to the fast growing market for unified communications,"* concluded Combs.

\*     \*     \*

**Business Outlook**

Based on current expectations, management is providing the following outlook for the quarter ending September 30, 2007:

Revenue is expected to be in the range of $29 to $31 million.

GAAP gross margins are expected to be in the range of 62% to 64%.

GAAP operating expenses are expected to be in the range of $17.5 to $18.5 million, including approximately $1 million in stock based compensation expense. [Emphasis added]

36.     On October 29, 2007, the Company issued a press released entitled "ShoreTel Reports Financial Results For Q1 Fiscal 2008." Therein, the Company, in relevant part, stated:

*"Growing revenue 57% year over year in a market that is growing at 18% to 28% confirms to us that we are gaining market share.* We continue to stay focused on developing leading Pure IP unified communications systems and delivering world class customer satisfaction to our customers globally," said John W. Combs, president and CEO of ShoreTel.

- 12 -
CLASS ACTION COMPLAINT

1    "I am also very pleased to report that we have expanded our
     relationship with AT&T by signing a master reseller agreement under
2    which AT&T will resell ShoreTel's Pure IP unified communications
     systems and implementation services. AT&T is one of the world's
3    largest resellers of enterprise telephony and we are excited to have
     AT&T as a channel partner," concluded Combs.
4

5                          *       *       *

6    **Business Outlook**

7    Based on current expectations, management is providing the
     following outlook for the quarter ending December 31, 2007:
8

9    Revenue is expected to be in the range of $32 to $35 million

10   GAAP gross margins are expected to be in the range of 62% to 64%

11   GAAP operating expenses are expected to be in the range of $19 to
     $20 million, including approximately $1.1 million in stock-based
12   compensation expense. [Emphasis added.]

13       37.    On November 19, 2007, the Company issued a press release entitled "ShoreTel

14   Announces Secondary Public Offering." Therein, the Company, in relevant part, stated:

15       ShoreTel, Inc., (NASDAQ: SHOR), a leading provider of IP
         telecommunications systems, announced today that certain selling
16       stockholders plan to offer 4.4 million shares of ShoreTel common
         stock in an underwritten public offering. The Company will not be
17       selling any shares in the offering and will not receive any proceeds
         from the sale of shares by the selling stockholders.
18

19       38.    On November 29, 2007, the Company issued a follow-up press release entitled

20   "ShoreTel Withdraws Registration Statement on Form S-1." Therein, the Company, in relevant part,

21   stated:

22       ShoreTel, Inc., (NASDAQ: SHOR), a leading provider of IP
         telecommunications systems, announced today that it filed an
23       application with the Securities and Exchange Commission (SEC) to
         withdraw its Registration Statement on Form S-1, Registration No.
24       333-147486, initially filed with the SEC on November 19, 2007.

25       ***The Company requested to withdraw its Registration Statement due
         to the unwillingness of the selling stockholder to sell shares under
26       the current capital market conditions.*** [Emphasis added.]

27

28

39.    On December 5, 2007, the Company issued a press release entitled "ShoreTel Named to 2007 Deloitte Technology Fast 500." Therein, the Company, in relevant part, stated:

> ShoreTel, Inc., (NASDAQ: SHOR), a leading provider of Pure IP Unified Communications solutions, today announced it has been named to the Deloitte Technology Fast 500, a ranking of the fastest growing technology, media, telecommunications and life sciences companies in North America based on fiscal year revenue growth over a five-year period from 2002 through 2006. ShoreTel revenues grew from just over $7 million in 2002 to more than $61 million in 2006, an increase of 759 percent. The company was ranked 216 out of 500 companies.
>
> ***"ShoreTel is delivering on the promise of unified communications for the enterprise,"*** *said Steve Timmerman, vice president of marketing at ShoreTel.* ***"Our phenomenal growth is the direct result of great products, top-notch channel partners, and an absolute dedication to customer satisfaction."***
>
> Two recent announcements demonstrate ShoreTel's continuing momentum. The company announced ShoreTel 7.5, which extends unified communications capabilities to mobile phones and increases support for international locations. The new release features increased capacity for ShoreTel's voice switches and two new telephones, a high-contrast color display telephone and an enhanced entry-level speakerphone. ShoreTel also announced an agreement with Syntellect Inc. to offer Syntellect's award-winning contact center solution to ShoreTel resellers globally. The agreement marks a key strategic move into the high-end contact center market and is a response to the needs of ShoreTel's growing list of large enterprise customers. In deployment after deployment, ShoreTel has provided enterprises and government agencies a very dependable, easy-to-manage, easy-to-use, unified communications solution. [Emphasis added.]

## The Truth Begins to Emerge

40.    On January 7, 2008, the Company shocked investors when it issued a press release entitled "ShoreTel Announces Preliminary Fiscal Second Quarter Results." Therein, the Company, in relevant part, stated:

> ShoreTel, Inc., (NASDAQ: SHOR), a leading provider of Pure IP Unified Communications solutions, today announced preliminary results for the quarter ended December 31, 2007. ***The Company expects revenue to be in the range of $29.7 to $30.7 million, lower than its previous expectation of $32 to $35 million.*** Gross margin percentage is expected to be within the guided range of 62 percent to

CLASS ACTION COMPLAINT

1    64 percent, and GAAP operating expenses are also expected to be within the previously guided range of $19 million to $20 million.

2

3    *"Despite delivering the second highest revenue quarter in the Company's history, we fell short of our expectations. Our preliminary review indicates that sales to existing customers grew during the quarter, however, sales to new customers declined. We are still in the process of analyzing the factors affecting our results for the quarter and will discuss the results further when we hold our regularly scheduled earnings conference call at the end of January," said John W. Combs, president and CEO of ShoreTel.*

4

5

6

7

8    The Company has not yet completed the preparation of its second quarter financial statements, including determining the final sales from our international distributors. Accordingly, the preliminary results provided in this press release are subject to the risk that upon completion of the second quarter financial statements there may be adjustments to the Company's financial information that could materially affect the preliminary results provided in this press release. ShoreTel plans to announce its complete results for the second quarter of fiscal 2008 after the close of markets on January 29, 2008. [Emphasis added.]

9

10

11

12

13

14    41.    Upon the release of this news, shares of the Company's stock declined $7.06 per

15 share, or 54 percent, to close on January 7, 2008 at $6.02 per share, on unusually heavy trading

16 volume.

17                    **PLAINTIFF'S CLASS ACTION ALLEGATIONS**

18    42.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

19 Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise

20 acquired ShoreTel's common stock pursuant or traceable to the Company's July 3, 2007 IPO, and

21 who were damaged thereby (the "Class"). Excluded from the Class are defendants, the officers and

22 directors of the Company, at all relevant times, members of their immediate families and their legal

23 representatives, heirs, successors or assigns and any entity in which defendants have or had a

24 controlling interest.

25    43.    The members of the Class are so numerous that joinder of all members is

26 impracticable. Throughout the Class Period, ShoreTel's common stock was actively traded on the

27 NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can

28 only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or

1    thousands of members in the proposed Class. Record owners and other members of the Class may

2    be identified from records maintained by ShoreTel or its transfer agent, and may be notified of the

3    pendency of this action by mail, using the form of notice similar to that customarily used in

4    securities class actions.

5         44.    Plaintiff's claims are typical of the claims of the members of the Class as all members

6    of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is

7    complained of herein.

8         45.    Plaintiff will fairly and adequately protect the interests of the members of the Class

9    and has retained counsel competent and experienced in class and securities litigation.

10        46.    Common questions of law and fact exist as to all members of the Class and

11   predominate over any questions solely affecting individual members of the Class.  Among the

12   questions of law and fact common to the Class are:

13               (a)    whether the federal securities laws were violated by defendants' acts as

14                      alleged herein;

15               (b)    whether statements made by defendants to the investing public during the

16                      Class Period misrepresented material facts about the business, operations and

17                      management of ShoreTel; and

18               (c)    to what extent the members of the Class have sustained damages and the

19                      proper measure of damages.

20        47.    A class action is superior to all other available methods for the fair and efficient

21   adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the

22   damages suffered by individual Class members may be relatively small, the expense and burden of

23   individual litigation make it impossible for members of the Class to individually redress the wrongs

24   done to them.  There will be no difficulty in the management of this action as a class action.

25                              **UNDISCLOSED ADVERSE FACTS**

26        48.    The market for ShoreTel's common stock was open, well-developed and efficient at

27   all relevant times.  As a result of these materially false and misleading statements and failures to

28   disclose, ShoreTel's common stock traded at artificially inflated prices during the Class Period.

CLASS ACTION COMPLAINT

1  Plaintiff and other members of the Class purchased or otherwise acquired ShoreTel's common stock

2  relying upon the integrity of the market price of ShoreTel's common stock and market information

3  relating to ShoreTel, and have been damaged thereby.

4      49.    During the Class Period, defendants materially misled the investing public, thereby

5  inflating the price of ShoreTel's common stock, by publicly issuing false and misleading statements

6  and omitting to disclose material facts necessary to make defendants' statements, as set forth herein,

7  not false and misleading.  Said statements and omissions were materially false and misleading in that

8  they failed to disclose material adverse information and misrepresented the truth about the Company,

9  its business and operations, as alleged herein.

10     50.    At all relevant times, the material misrepresentations and omissions particularized in

11  this Complaint directly or proximately caused or were a substantial contributing cause of the

12  damages sustained by Plaintiff and other members of the Class.  As described herein, during the

13  Class Period, defendants made or caused to be made a series of materially false or misleading

14  statements about ShoreTel's financial well-being and operations.  These material misstatements and

15  omissions had the cause and effect of creating in the market an unrealistically positive assessment of

16  ShoreTel and its financial well-being and operations, thus causing the Company's common stock to

17  be overvalued and artificially inflated at all relevant times.  Defendants' materially false and

18  misleading statements during the Class Period resulted in Plaintiff and other members of the Class

19  purchasing the Company's common stock at artificially inflated prices, thus causing the damages

20  complained of herein.

21                              **LOSS CAUSATION**

22     51.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the

23  economic loss suffered by Plaintiff and the Class.

24     52.    During the Class Period, Plaintiff and the Class purchased common stock of ShoreTel

25  at artificially inflated prices and were damaged thereby.  The price of ShoreTel's common stock

26  significantly declined when the misrepresentations made to the market, and/or the information

27  alleged herein to have been concealed from the market, and/or the effects thereof, were revealed,

28  causing investors' losses.

1

**Applicability of Presumption of Reliance:**
**Fraud On The Market Doctrine**

2

3       53.     At all relevant times, the market for ShoreTel's common stock was an efficient market

4    for the following reasons, among others:

5                   (a)     ShoreTel stock met the requirements for listing, and was listed and actively

6                           traded on the NASDAQ, a highly efficient and automated market;

7                   (b)     As a regulated issuer, ShoreTel filed periodic public reports with the SEC

8                           and the NASDAQ;

9                   (c)     ShoreTel regularly communicated with public investors via established

10                          market    communication    mechanisms,    including    through    regular

11                          disseminations of press releases on the national circuits of major newswire

12                          services and through other wide-ranging public disclosures, such as

13                          communications with the financial press and other similar reporting services;

14                          and

15                  (d)     ShoreTel was followed by several securities analysts employed by major

16                          brokerage firms who wrote reports which were distributed to the sales force

17                          and certain customers of their respective brokerage firms.  Each of these

18                          reports was publicly available and entered the public marketplace.

19      54.     As a result of the foregoing, the market for ShoreTel's common stock promptly

20   digested current information regarding ShoreTel from all publicly-available sources and reflected

21   such information in ShoreTel's stock price. Under these circumstances, all purchasers of ShoreTel's

22   common stock during the Class Period suffered similar injury through their purchase of the

23   Company's common stock at artificially inflated prices and a presumption of reliance applies.

24                                        **NO SAFE HARBOR**

25      55.     The statutory safe harbor provided for forward-looking statements under certain

26   circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

27   Many of the specific statements pleaded herein were not identified as "forward-looking statements"

28   when made.  To the extent there were any forward-looking statements, there were no meaningful

1    cautionary statements identifying important factors that could cause actual results to differ materially

2    from those in the purportedly forward-looking statements. Alternatively, to the extent that the

3    statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are

4    liable for those false forward-looking statements, because at the time each of those forward-looking

5    statements was made, the particular speaker knew that the particular forward-looking statement was

6    false, and/or the forward-looking statement was authorized and/or approved by an executive officer

7    of ShoreTel who knew that those statements were false when made.

8

**FIRST CLAIM**
**Violation of Section 11 of**

9

**The Securities Act Against All Defendants**

10    56.    Plaintiff repeats and realleges each and every allegation contained above as if fully set

11    forth herein only to the extent, however, that such allegations do not allege fraud, scienter or the

12    intent of the defendants to defraud Plaintiff or members of the Class. This count is predicated upon

13    defendants' strict liability for making false and materially misleading statements in the Registration

14    Statement.

15    57.    This claim is asserted by Plaintiff against all defendants by, and on behalf of, persons

16    who acquired shares of the Company's common stock pursuant to or traceable to the false

17    Registration Statement issued in connection with the July 3, 2007 IPO.

18    58.    Individual Defendants as signatories of the Registration Statement, as directors and/or

19    officers of ShoreTel and controlling persons of the issuer, owed to the holders of the stock obtained

20    through the Registration Statement the duty to make a reasonable and diligent investigation of the

21    statements contained in the Registration Statement at the time they became effective to ensure that

22    such statements were true and correct, and that there was no omission of material facts required to be

23    stated in order to make the statements contained therein not misleading. Defendants knew, or in the

24    exercise of reasonable care should have known, of the material misstatements and omissions

25    contained in or omitted from the Registration Statement as set forth herein. As such, defendants are

26    liable to the Class.

27    59.    Underwriter Defendants owed to the holders of the stock obtained through the

28    Registration Statement the duty to make a reasonable and diligent investigation of the statements

1  contained in the Registration Statement at the time they became effective to ensure that such
2  statements were true and correct and that there was no omission of material facts required to be
3  stated in order to make the statements contained therein not misleading. Defendants knew, or in the
4  exercise of reasonable care should have known, of the material misstatements and omissions
5  contained in or omitted from the Registration Statement as set forth herein. As such, defendants are
6  liable to the Class.

7       60.    None of the defendants made a reasonable investigation or possessed reasonable
8  grounds for the belief that the statements contained in the Registration Statement were true or that
9  there was no omission of material facts necessary to make the statements made therein not
10 misleading.

11      61.    Defendants issued and disseminated, caused to be issued and disseminated, and
12 participated in the issuance and dissemination of, material misstatements to the investing public
13 which were contained in the Registration Statement, which misrepresented or failed to disclose, *inter*
14 *alia*, the facts set forth above. By reason of the conduct herein alleged, each defendant violated
15 and/or controlled a person who violated Section 11 of the Securities Act.

16      62.    As a direct and proximate result of defendants' acts and omissions in violation of the
17 Securities Act, the market price of ShoreTel's common stock sold in the IPO was artificially inflated,
18 and Plaintiff and the Class suffered substantial damage in connection with their ownership of
19 ShoreTel's common stock pursuant to the Registration Statement.

20      63.    ShoreTel is the issuer of the stock sold <u>via</u> the Registration Statement. As issuer of
21 the stock, the Company is strictly liable to Plaintiff and the Class for the material misstatements and
22 omissions therein.

23      64.    At the times they obtained their shares of ShoreTel, Plaintiff and members of the
24 Class did so without knowledge of the facts concerning the misstatements or omissions alleged
25 herein.

26      65.    This action is brought within one year after discovery of the untrue statements and
27 omissions in and from the Registration Statement which should have been made through the exercise
28 of reasonable diligence, and within three years of the effective date of the Prospectus.

CLASS ACTION COMPLAINT

66. By virtue of the foregoing, Plaintiff and the other members of the Class are entitled to damages under Section 11 as measured by the provisions of Section 11(e), from the defendants and each of them, jointly and severally.

**SECOND CLAIM**
**Violation of Section 12(a)(2) of**
**The Securities Act Against All Defendants**

67. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

68. This Count is brought pursuant to Section 12(a)(2) of the Securities Act on behalf of the Class, against all defendants.

69. Defendants were sellers, offerors, and/or solicitors of purchasers of the shares offered pursuant to the ShoreTel Offering Registration Statement.

70. The ShoreTel IPO Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts. The Individual Defendants' actions of solicitation included participating in the preparation of the false the misleading Registration Statement.

71. Defendants owed to the purchasers of ShoreTel's common stock, including Plaintiff and other members of the Class, the duty to make a reasonable and diligent investigation of the statements contained in the IPO materials, including the Registration Statement, to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Defendants knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the IPO materials as set forth above.

72. Plaintiff and other members of the Class purchased or otherwise acquired ShoreTel's common stock pursuant to and/or traceable to the defective Registration Statement. Plaintiff did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Registration Statement.

73. Plaintiff, individually and representatively, hereby offer to tender to defendants that common stock which Plaintiff and other Class members continue to own, on behalf of all members

- 21 -
CLASS ACTION COMPLAINT

1   of the Class who continue to own such common stock, in return for the consideration paid for that

2   common stock together with interest thereon. Class members who have sold their ShoreTel common

3   stock are entitled to rescissory damages.

4        74.    By reason of the conduct alleged herein, these defendants violated, and/or controlled

5   a person who violated Section 12(a)(2) of the Securities Act. Accordingly, Plaintiff and members of

6   the Class who hold ShoreTel common stock purchased in the IPO have the right to rescind and

7   recover the consideration paid for their ShoreTel common stock, and hereby elect to rescind and

8   tender their ShoreTel common stock to the defendants sued herein. Plaintiff and Class members

9   who have sold their ShoreTel common stock are entitled to rescissory damages.

10        75.    This action is brought within three years from the time that the common stock upon

11   which this Count is brought was sold to the public, and within one year from the time when Plaintiff

12   discovered or reasonably could have discovered the facts upon which this Count is based.

### THIRD CLAIM
**Violation of Section 15 of The Securities Act**
**Against the Individual Defendants**

15        76.    Plaintiff repeats and realleges each and every allegation contained above, excluding

16   all allegations above that contain facts necessary to prove any elements not required to state a

17   Section 15 claim, including without limitation, scienter.

18        77.    This count is asserted against Individual Defendants and is based upon Section 15 of

19   the Securities Act.

20        78.    Individual Defendants, by virtue of their offices, directorship and specific acts were,

21   at the time of the wrongs alleged herein and as set forth herein, controlling persons of ShoreTel

22   within the meaning of Section 15 of the Securities Act. The Individual Defendants had the power

23   and influence and exercised the same to cause ShoreTel to engage in the acts described herein.

24        79.    Individual Defendants' position made them privy to and provided them with actual

25   knowledge of the material facts concealed from Plaintiff and the Class.

26        80.    By virtue of the conduct alleged herein, the Individual Defendants are liable for the

27   aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

28

CLASS ACTION COMPLAINT

1    **WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

2          (a)    Determining that this action is a proper class action under Rule 23 of the

3                Federal Rules of Civil Procedure;

4          (b)    Awarding compensatory damages in favor of Plaintiff and the other Class

5                members against all defendants, jointly and severally, for all damages

6                sustained as a result of defendants' wrongdoing, in an amount to be proven at

7                trial, including interest thereon;

8          (c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred

9                in this action, including counsel fees and expert fees; and

10        (d)    Such other and further relief as the Court may deem just and proper.

11    **<u>JURY TRIAL DEMANDED</u>**

12    Plaintiff hereby demands a trial by jury.

13    Dated: January 29, 2008          SCHIFFRIN BARROWAY TOPAZ & KESSLER, LLP

14

15    _____

16    Alan R. Plutzik, Of Counsel (Bar No. 077758)
L. Timothy Fisher, Of Counsel (Bar No. 191626)
2125 Oak Grove Road, Suite 120

17    Walnut Creek, CA 94598
Telephone: (925) 945-0770

18    Facsimile: (925) 945-8792

19

20                - and -

21    Richard A. Maniskas
D. Seamus Kaskela
280 King of Prussia Road

22    Radnor, PA 19087
Telephone: (610) 667-7706

23    Facsimile: (610) 667-7056

24                - and -

25    Brodsky & Smith, LLC

26    Evan J. Smith, Esquire
Two Bala Plaza, Suite 602

27    Bala Cynwyd, PA 19004
Telephone: (610) 667-6200

28    Facsimile: (610) 667-9029

## PLAINTIFF'S CERTIFICATION

I, (Mr./Ms.) __Phynice Kelley__ , ("Plaintiff") declares under penalty of perjury, as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed the complaint and authorized the commencement of an action on Plaintiff's behalf.

2.    Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff's transactions in __ShoreTel__ of securities during the Class Period specified in the Complaint are as follows (use additional sheet if necessary):

| Date | # of Shares Purchased | # of Shares Sold | Price/Share |
|------|----------------------|------------------|-------------|
| 8-14-07 | 47 0.5548 | | 14.42 |
| 10-03-07 | 0.2899 | | 17.25 |
| 12-18-07 | 0.4781 | | 14.24 |
| 7-18-07 | 1.000 | | 14.44 |

5.    During the three years prior to the date of this Certificate, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws. [Or, Plaintiff has served as a class representative in the action(s) listed as follows:]

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this __29__ day of __January__, 2008.

Sign Name: _Phynice Kelley_
Print Name: _Phynice Kelley_